**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000496
21-MAY-2020
07:59 AM**

NO. CAAP-19-0000496

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


JZ, Plaintiff-Appellee,
v.
JZ, Defendant-Appellant

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-D NO. 17-1-0213)

MEMORANDUM OPINION
(By:  Leonard, Presiding Judge, Chan and Hiraoka, JJ.)

Hawai'i divorce cases involve a maximum of four discrete parts: **(1)** dissolution of the marriage; **(2)** child custody, visitation, and support; **(3)** spousal support; and **(4)** division and distribution of property and debts.  Eaton v. Eaton, 7 Haw. App. 111, 118, 748 P.2d 801, 805 (1987).  The only part not at issue in this appeal is the dissolution of the parties' marriage.


**BACKGROUND**

Defendant-Appellant JZ (**Mother**) and Plaintiff-Appellee JZ (**Father**) were married and have three minor children (collectively, the **Children**).  Father filed for divorce.  After a trial, the Family Court of the First Circuit[1] entered a "Decree Granting Absolute Divorce and Awarding Child Custody" (**Decree**) and a **Judgment**.  Mother appealed.  Mother raises four points of error, contending that the family court:

> 1.    abused its discretion in awarding sole physical custody of the Children to Father;
>
> 2.    erred in calculating Mother's and Father's income, and in calculating Mother's child support obligation;

---

[1]    The Honorable Jessi L.K. Hall presided.

3. erred in dividing and distributing Mother's and Father's property; and

4. erred by reducing Mother's child support obligation in lieu of awarding her spousal support.

In response, Father (through counsel) filed a notice that he "will not be filing an answering Brief [sic] in this matter, and relies on the Trial Court's Order, Findings of Facts, and Conclusions of Law."

For the reasons explained below, we affirm the Judgment, vacate the Decree in part, vacate the family court's findings of fact and conclusions of law that are inconsistent with this opinion, and remand this case to the family court for further proceedings.

## PROCEDURAL HISTORY

Mother and Father were married on March 16, 2008. The Children were born in 2011 and 2012. Father filed for divorce on February 23, 2017. Extensive litigation followed, including multiple motions for pre-decree relief, numerous discovery disputes, three restraining orders, and a disputed post-nuptial agreement. The family court appointed Nicole K. Cummings (**Best-Interest Fact Finder**) to be the children's best-interest fact finder pursuant to Hawaii Revised Statutes (**HRS**) §§ 571-46 ("Criteria and procedure in awarding custody and visitation; best interest of the child") and 571-46.4 ("Child custody evaluators"). The Best-Interest Fact Finder was directed to submit a report to the family court on certain issues, with recommendations. Her 144-page report was filed (under seal)[2] on June 4, 2018.

---

[2] HRS § 571-84(a) (2016) provides, in relevant part:

[I]n proceedings under section 571-11 [to determine the custody of any child] . . . the following records shall be withheld from public inspection: the court docket, petitions, complaints, motions, and other papers filed in any case; transcripts of testimony taken by the court; and findings, judgments, orders, decrees, and other papers other than social records filed in proceedings before the court.

The trial took place over 12 days in late 2018 and early 2019. The family court heard testimony from Mother, Father, the Best-Interest Fact Finder, and seven other witnesses. On May 14, 2019, the family court entered its "Decision and Order re: Trial" **(D&O)**. The Decree and the Judgment were entered on June 14, 2019. Mother appealed. The family court's findings of fact and conclusions of law **(Findings & Conclusions)** were entered on September 9, 2019.[3]

## STANDARDS OF REVIEW

> [T]he family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai‘i 41, 46, 137 P.3d 355, 360 (2006) (citation omitted).

Mother challenges 114 of the family court's findings of fact. Findings of fact are reviewed under the "clearly erroneous" standard. Fisher, 111 Hawai‘i at 46, 137 P.3d at 360. A finding of fact is clearly erroneous when the record lacks substantial evidence to support the finding, or despite substantial evidence in support of the finding, we are nonetheless left with a definite and firm conviction that a mistake has been made. Id. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Id.

The family court made several specific findings regarding witness credibility:

> 38.    The [Best-Interest] Fact Finder's report and [her] testimony was comprehensive and persuasive to the Court.

---

[3]    Rule 52(a) of the Hawai‘i Family Court Rules provides, in relevant part:

> [U]pon notice of appeal filed with the court, the court shall enter its findings of fact and conclusions of law where none have been entered, unless the written decision of the court contains findings of fact and conclusions of law.

. . . .

> 66.    The Court finds the testimony of [Mother's former housemate] to be credible.
>
> 67.    The Court did not find [Mother]'s testimony regarding her limited consumption of prescription drugs and alcohol, and the fact that she did not mix the two substances to be credible.
>
> . . . .
>
> 202.    The Court finds [Mother's business valuation expert]'s report to not be credible as he was only provided a limited amount of information by [Mother]'s counsel, limiting his ability to perform a complete analysis.

"It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact." Fisher, 111 Hawai'i at 46, 137 P.3d at 360 (citation omitted).

Mother also challenges 19 of the family court's conclusions of law. Conclusions of law are ordinarily reviewed de novo, under the right/wrong standard, "and are freely reviewable for their correctness." Fisher, 111 Hawai'i at 46, 137 P.3d at 360. However, if a conclusion of law presents mixed questions of fact and law, we review it under the "clearly erroneous" standard because the conclusion is dependent on the facts and circumstances of the case. Estate of Klink ex rel. Klink v. State, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007).

## DISCUSSION

We discuss each of Mother's points of error in the order raised in her opening brief.

### I.    Child Custody and Visitation

The family courts are uniquely positioned as triers of fact in complicated and emotional child custody cases; appellate courts afford them great deference in making custody decisions and in determining what is in the best interests of the child. DJ v. CJ, No. SCWC-17-0000027, 2020 WL 1879625 (Haw. Apr. 13, 2020) (Nakayama, J., concurring and dissenting) (citing AA v. BB, 139 Hawai'i 102, 106, 384 P.3d 878, 882 (2016)). "The criteria and procedures for the family court to award custody and determine the best interests of the child are set forth in

4

HRS § 571-46." <u>WN v. SM</u>, 143 Hawai'i 128, 135, 424 P.3d 483, 490 (2018) (citation omitted). The statute provides, in relevant part:

(a) In actions for divorce . . . where there is at issue a dispute as to the custody of a minor child, the court . . . may make an order for the custody of the minor child as may seem necessary or proper. In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:

(1) Custody should be awarded to either parent or to both parents according to the best interests of the child, and the court also may consider frequent, continuing, and meaningful contact of each parent with the child unless the court finds that a parent is unable to act in the best interest of the child;

. . . .

(4) Whenever good cause appears therefor, the court may require an investigation and report concerning the care, welfare, and custody of any minor child of the parties. When so directed by the court, investigators or professional personnel attached to or assisting the court, hereinafter referred to as child custody evaluators, shall make investigations and reports that shall be made available to all interested parties and counsel before hearing, and the reports may be received in evidence[;]

(5) The court may hear the testimony of any person or expert, produced by any party or upon the court's own motion, whose skill, insight, knowledge, or experience is such that the person's or expert's testimony is relevant to a just and reasonable determination of what is for the best physical, mental, moral, and spiritual well-being of the child whose custody is at issue[.]

. . . .

(b) In determining what constitutes the best interest of the child under this section, the court shall consider, but not be limited to, the following:

. . . .

(2) Any history of neglect or emotional abuse of a child by a parent;

(3) The overall quality of the parent-child relationship;

(4) The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;

(5) Each parent's cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule; provided that this factor shall not be considered in any case

5

where the court has determined that family
violence has been committed by a parent;

(6)     The physical health needs of the child;

(7)     The emotional needs of the child;

(8)     The safety needs of the child;

(9)     The educational needs of the child;

(10)    The child's need for relationships with
        siblings;

(11)    Each parent's actions demonstrating that they
        allow the child to maintain family connections
        through family events and activities; provided
        that this factor shall not be considered in any
        case where the court has determined that family
        violence has been committed by a parent;

(12)    Each parent's actions demonstrating that they
        separate the child's needs from the parent's
        needs;

(13)    Any evidence of past or current drug or alcohol
        abuse by a parent;

(14)    The mental health of each parent;

(15)    The areas and levels of conflict present within
        the family; and

(16)    A parent's prior wilful misuse of the protection
        from abuse process under chapter 586 to gain a
        tactical advantage in any proceeding involving
        the custody determination of a minor.  Such
        willful misuse may be considered only if it is
        established by clear and convincing evidence,
        and if it is further found by clear and con-
        vincing evidence that in the particular family
        circumstances the wilful misuse tends to show
        that, in the future, the parent who engaged in
        the wilful misuse will not be able to cooperate
        successfully with the other parent in their
        shared responsibilities for the child.  The
        court shall articulate findings of fact whenever
        relying upon this factor as part of its determi-
        nation of the best interest of the child.

HRS § 571-46 (2018).

In this case, the family court's D&O states:

2.    Custody.

        . . . .

        b.    Physical Custody.  [Father] shall be awarded
sole physical custody of the parties' minor children,
subject to [Mother]'s rights of reasonable timesharing as
set out below.

6

The Findings & Conclusions contain 82 findings of fact (not including subparts) relating to child custody. The findings make reference to the Best-Interest Fact Finder's report and testimony (which the family court found to be "comprehensive and persuasive"), Mother's response to Father's request for admissions, specific trial exhibits, and testimony from Mother, Father, the Best-Interest Fact Finder, Mother's former housemate (whom the family court found to be credible), and Mother's psychologist.[4] The family court made specific findings concerning the factors enumerated in HRS § 571-46(b). The Findings & Conclusions contained the following conclusion of law:

> 12. [Father] shall be awarded sole physical custody of the parties' minor children, subject to [Mother]'s rights of reasonable timesharing as set out below.

Based upon our review of the trial record, we hold that the family court's findings of fact on the issue of child custody were supported by substantial evidence, and that the family court did not err by awarding sole physical custody of the Children to Father, subject to Mother's visitation rights as set out in the Findings & Conclusions.

## II. Child Support

The family court must utilize the current Hawai'i Child Support Guidelines (**Guidelines**) to set or modify child support orders unless exceptional circumstances warrant departure. PO v. JS, 139 Hawai'i 434, 442, 393 P.3d 986, 994 (2017). The Guidelines are promulgated by the Hawai'i family courts. They contain substantive rules and principles for calculating support, and

---

[4] Mother argues that the family court erred in striking her expert witnesses, Dr. Marvin W. Acklin (who was to proffer opinion testimony relating to child custody) and Stephen H. Reese (a lawyer who was to proffer opinion testimony relating to business interests). Mother mistakenly contends that "there is no law or court order issued in this case that required [Mother] to produce a report in order for [her expert witnesses] to be permitted to testify at trial." The family court's pretrial order no. 1, entered on July 19, 2018, required that experts' reports be exchanged, and set a deadline. Mother concedes that neither Dr. Acklin nor Mr. Reese prepared a report. The family court did not abuse its discretion by granting Father's motion to strike those witnesses. See Komata v. Komata, No. CAAP-11-0000537, 2012 WL 5359175, at *1-*2 (Haw. App. Oct. 31, 2012) (mem.) (citing Glover v. Grace Pac. Corp., 86 Hawai'i 154, 164, 948 P.2d 575, 585 (App. 1997) (precluding expert from testifying due to failure to produce timely report, without finding bad faith or prejudice)).

7

include various appendices; Appendix A includes the "Child Support Guidelines Worksheet" (**CSG Worksheet**), which is used to determine the initial calculation of a parent's monthly support obligation.  Id. at 441-42, 393 P.3d at 993-94.  The family court's determination of what is an exceptional circumstance authorizing deviation from the Guidelines is a conclusion of law reviewed de novo under the right/wrong standard of review.  Child Support Enf't Agency v. Doe, 104 Hawai'i 449, 455, 91 P.3d 1092, 1098 (App. 2004).  Decisions whether to order such deviations are discretionary decisions reviewed under the abuse of discretion standard of review.  Id.

## A.    Father's Fluctuating Income

Father was self-employed.[5]  For a self-employed parent, the Guidelines (2014) provide, in relevant part:

III.  OTHER CHILD SUPPORT CONSIDERATIONS

    . . . .

E.    SELF-EMPLOYED INDIVIDUALS

1.    **SELF-EMPLOYED** individuals with gross incomes under $13,000 per month may calculate Monthly Net Income (Line 2) using either the automated version of the CSG WORKSHEET or the manual steps in §III.E.2. below.  *Self-employed individuals must report gross income minus ordinary, necessary and reasonable business/operating expenses, and may include a reasonable amount for ordinary wear and tear of capital assets (calculated on a straight line basis over the useful life of the asset), minus one-half of self-employment taxes (refer to tax returns).*  The Court or OCSH may determine what (if any) depreciation may be subtracted.

2.    **SELF-EMPLOYED INDIVIDUALS WITH INCOME OVER $13,000 PER MONTH** may calculate Monthly Net Income (Line 2) by using either the automated version of the CSG WORKSHEET (on gross income up to $999,999.00 per month) or by using the manual steps below.  *A worksheet for Self-Employed Individuals With Income Over $13,000 Per Month is attached as Appendix E.*

---

[5]    See discussion below regarding JZ Insurance Services, LLC.

a.    <u>STEP ONE</u>

Add the gross monthly <u>earned</u> income from all sources

Deduct any **allowable ordinary and necessary expenses** (<u>see</u> §III.E.1.)

Calculate net self-employment income (gross less allowed expenses)

Multiply the net self-employment income by 92.35% (.9235) to calculate the amount subject to Self-Employment Tax

Calculate the self-employment tax on 92.35% of net self-employment income, 15.3% on net earned income up to $9,475 per month, and 2.9% on net earned income above that amount

b.    <u>STEP TWO</u>

Use the net self-employment income as calculated above.

Add all other remaining non-earned income for Total Income Subject to Tax

Deduct ½ of the Self-Employment Tax

Calculate State and Federal Tax on the result using the applicable tables (<u>see</u> §III.D.2.(b)(c)).

c.    <u>STEP THREE</u>

Use the Total Income Subject To Tax from Step 2

Subtract
      Self-Employment Tax
      State Income Tax
      Federal Income Tax
      Self-Support of $840 (after tax poverty level self-support in Hawai'i)

The result is the Net Income for CSG WORKSHEET.

Guidelines at 16-17 (footnotes omitted) (bold italics added).

Father's proposed CSG Worksheet set his monthly gross income at $15,000. Mother proposed that Father's monthly gross income be imputed at $25,000. The record on appeal indicates that the family court relied on Father's income and expense statement filed on November 15, 2018, and Father's tax returns, to find:

> 97.    [Father]'s income fluctuates; as such it is reasonable to impute his income at $18,000.00 per month.

There is no indication in the record that the family court or either of the parties used Appendix E to the Guidelines to calculate Father's gross monthly income. The family court made no findings or conclusions as to why it could not do the Appendix E analysis. Thus, it was premature to simply impute income to Father based upon fluctuating amounts of gross income.

We cannot determine, based on the record, whether or not the family court's finding that Father's imputed gross monthly income was $18,000 is supported by substantial evidence. Accordingly, we vacate the family court's calculation of Father's imputed gross monthly income and the parties' resultant child support obligations. On remand, the family court should require that the parties each submit an Appendix E analysis with references to supporting evidence for each of the Step One, Step Two, and Step Three calculations. The family court should then, if possible, make its own findings and conclusions as to the proper calculations based on its own Guidelines analysis, weighing any conflicting evidence and making credibility determinations, if necessary. If at that point it is not possible based on the evidence and arguments to determine father's self-employment income, the family court should make appropriate findings as to that impossibility, and then make findings as to the basis for the amount of income imputed to Father. See IS v. PS, CAAP-10-0000082, 2013 WL 4458889, at *7 (Haw. App. Aug. 21, 2013) (mem.) (when family court imputes income to parent, it must make findings explaining why and how income was imputed).

### B.    Mother's Income

Father's proposed CSG Worksheet set Mother's monthly gross income at $6,472. Mother's proposed findings of fact set her monthly income at $3,810, which was the amount of her social security disability benefit. Mother has not challenged the following findings of fact:

> 99.    [Mother] testified that she currently works part-time at Allstate Insurance as a Marketing Coordinator.

100. [Mother] provided an e-mail dated February 6, 2019 from Rory Lee offering her a position with Allstate Insurance. (See [Mother]'s Exhibit "JJJJJ".)

101. [Mother] testified that she is currently in a part-time position as full time hours are not available to her.

. . . .

104. [Mother] testified that she rents out a room in the upstairs area of her Hawaii Kai residence for $1,400.00 per month and the downstairs area for $2,000.00 per month.

105. [Mother] testified, and per her Income and Expense Statement filed April 1, 2019, that she receives $3,810.00 per month for herself and the children for Social Security Disability. (See [Mother]'s Exhibit "TTTTT".)

106. [Mother] submitted a letter from August 18, 2015 regarding her employment offer with United Auto Credit. [Mother] was employed while receiving Social Security Disability. (See [Mother]'s Exhibit "W".)

107. [Mother] shall continue to receive the Social Security Disability payments on behalf of the children and said amount shall be included in her income for child support purposes.

Based upon Mother's part-time (two days per week according to her exhibit JJJJJ) income of $1,200 per month, the family court found that Mother would earn $3,000 per month if she worked full-time, and imputed that amount as income to Mother.

The Hawai'i Supreme Court has instructed:

in determining gross income for calculation of child support, the Guidelines permit the family court to use imputed income when a parent is not employed full-time or is employed below full earning capacity. When the parent is . . . underemployed for reasons other than caring for the child, the parent's income may be determined and imputed by the family court according to the parent's income capacity in the local job market and considering both the reasonable needs of the child(ren) and the reasonable work aspirations of the parent.

PO v. JS, 139 Hawai'i at 442 n.16, 393 P.3d at 994 n.16 (cleaned up). The following findings of fact, although challenged by Mother, are supported by substantial evidence in the record:

120. [Mother] testified that recently her health has improved and that she is no longer unable to obtain employment due to a disability.

121. [Mother] has academic and professional credentials to include: Bachelor of Arts, Masters in Business Administration, Insurance License, and Real Estate License.

122. [Mother] testified that she is highly qualified
in the areas of Business Administration and sales.

The family court also found, and the record bears out, that Mother "did not provide testimony or evidence that she is physically or mentally incapable of working full-time." It appears that the family court performed a mathematical calculation of Mother's full-time earning capacity based upon Mother earning $1,200 per month for two days of work per week — or $600 per work day — and multiplied the per-day amount by 5 to calculate imputed full-time income. The family court did not clearly err by calculating imputed full-time income based upon Mother's part-time compensation and qualifications. Adding the uncontested total rental income of $3,400 per month, and her social security disability income of $3,810 per month, the family court found Mother's monthly gross income to be $10,210. The family court's calculation of Mother's income was supported by substantial evidence. The family court did not err in finding that Mother's imputed monthly gross income was $10,210.

### C. Child Support

Because we are remanding this case for the family court to enter specific findings of fact explaining its calculation of Father's gross monthly income or to recalculate the amount of Father's monthly gross income, on remand the family court should also recalculate (if necessary) the parties' child support obligations using Appendix E to the Guidelines and the CSG Worksheet.

### III. Property Division and Distribution

The family court's final division and distribution of property in a divorce is reviewed under the abuse of discretion standard, in view of the factors set forth in HRS § 580-47 and the marital partnership model. Selvage v. Moire, 139 Hawai'i 499, 506-07, 394 P.3d 729, 736-37 (2017).

HRS § 580-47 (2018) provides, in relevant part:

> (a)   Upon granting a divorce . . . the [family] court may make any further orders as shall appear just and equitable . . . (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community,

> joint, or separate[.] . . . In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, the concealment of or failure to disclose income or an asset, or violation of a restraining order issued under section 580-10(a) or (b), if any, by either party, and all other circumstances of the case.

> Under the marital partnership model:

> Marital partnerships are equal partnerships. During a marriage, both partners enjoy the consequences of one partner's successes and both partners suffer the consequences of one partner's failures. . . . Absent a legally permissible and binding partnership agreement to the contrary [i.e., a valid premarital agreement], partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services.

Jackson v. Jackson, 84 Hawai'i 319, 333-34, 933 P.2d 1353, 1367-68 (App. 1997) (cleaned up). The marital partnership model recognizes three general classifications of property:

> **Premarital Separate Property.** This was the property owned by each spouse immediately prior to their marriage or cohabitation that was concluded by their marriage. Upon marriage, this property became either Marital Separate Property or Marital Partnership Property.

> **Marital Separate Property.** This is the following property owned by one or both of the spouses at the time of the divorce:

>> a.    All property that was excluded from the marital partnership by an agreement in conformity with the Hawai'i Uniform Premarital Agreement Act (HUPAA), HRS chapter 572D (Supp.1992);

>> b.    All property that was excluded from the marital partnership by a valid contract; and

>> c.    All property that (1) was acquired by the spouse-owner during the marriage by gift or inheritance, (2) was expressly classified by the donee/heir-spouse-owner as [their] separate property, and (3) after acquisition, was maintained by itself and/or sources other than one or both of the spouses and funded by sources other than marital partnership income or property.

> **Marital Partnership Property.** All property that is not Marital Separate Property.

Hamilton v. Hamilton, 138 Hawai'i 185, 200-01, 378 P.3d 901, 916-17 (2016) (cleaned up).

When dividing Marital Partnership Property, the family court utilizes five categories of net market value (**NMV**):

> **Category 1.** The NMV, plus or minus, of all property separately owned by one spouse on the date of marriage (**DOM**) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> **Category 2.** The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the date of the conclusion of the evidentiary part of the trial (**DOCOEPOT**).
>
> **Category 3.** The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> **Category 4.** The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.
>
> **Category 5.** The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

Selvage, 139 Hawai'i at 507, 394 P.3d at 737 (cleaned up).

> Each partner's individual contributions to the marriage, i.e., the values of Category 1 and Category 3, are to be repaid to the contributing spouse absent equitable considerations justifying a deviation.
>
> Absent equitable considerations justifying a different result, the increase in the value of each partner's individual contributions to the marriage, i.e., the values of Category 2 and Category 4, are divided equally between the parties.
>
> The value of Category 5, which is the net profit or loss of the marital partnership after deducting the other four categories, is to be divided equally unless equitable considerations merit deviation.
>
> If there is no agreement between the [partners] defining the respective property interests, partnership principles dictate an equal division of the marital estate where the only facts proved are the marriage itself and the existence of jointly owned property. In other words, the values of Category 2, Category 4, and Category 5 are awarded one-half to each spouse absent equitable considerations justifying deviation from a 50/50 distribution.

Gordon v. Gordon, 135 Hawai'i 340, 349-50, 350 P.3d 1008, 1017-18 (2015) (cleaned up).

To divide property the family court must: **(1)** find all of the facts necessary for categorization of the properties and assignment of the relevant NMVs; **(2)** identify any equitable considerations justifying deviation from an equal distribution, focusing on the present and the future, not the past; **(3)** decide whether or not there will be a deviation; and **(4)** decide the extent of any deviation. Selvage, 139 Hawai'i at 509-10, 394 P.3d at 739-40. The family court must then file, as part of its findings and conclusions, a property division chart[6] that includes the following:

> **(1)** all of the parties' assets stating the relevant net market values of the assets using the five-category scheme of the partnership model,
>
> **(2)** the partnership model division of the assets,
>
> **(3)** the actual division of the assets, and
>
> **(4)** an explanation of the reasons for the material differences between the partnership model division and the actual division.

Gordon, 135 Hawai'i at 351, 350 P.3d at 1019 (bold added) (citing Higashi v. Higashi, 106 Hawai'i 228, 230, 103 P.3d 388, 390 (App. 2004)).[7] The family court's determination of whether the facts

---

[6] A form of property division chart is available as an Excel spread-sheet at Family Court Forms for O'ahu (First Circuit), Hawai'i State Judiciary, https://www.courts.state.hi.us/self-help/courts/forms/oahu/family_court_forms (last visited May 12, 2020).

[7] Higashi directs the family court to include the following in its property division chart:

> **(a)** an itemized list of each of plaintiff's Category 1 and 3 assets/debts, stating **(i)** the Category 1 and 3 value/amount of each and **(ii)** the Category 2 and 4 net market value of each asset;
>
> **(b)** an itemized list of each of defendant's Category 1 and 3 assets/debts, stating **(i)** the Category 1 and 3 value/amount of each and **(ii)** the Category 2 and 4 net market value of each asset;
>
> **(c)** an itemized list of each of plaintiff's and/or defendant's Category 5 assets/debts stating the net market value of each;
>
> **(d)** an itemized statement of the Partnership Model Division of each of the assets/debts owned/owed at the time of the divorce;

of the case present equitable considerations authorizing a deviation from the partnership model division is a question of law reviewed under the right/wrong standard of appellate review. Selvage, 139 Hawaiʻi at 507, 394 P.3d at 737.

## A.   JZ Insurance Services, LLC

Mother contends that the family court "erred in effectively determining that the parties' insurance business was not a business, and in its valuation and division of that business."  Mother's contentions have no merit.

The family court made the following findings of fact, which were supported by substantial evidence:

> 131.   [Father] has a business known as JZ Insurance Services, LLC, (hereinafter "JZ Insurance") in which he services insurance contracts, policies, and accounts.
>
> . . . .
>
> 134.   Pursuant to the 2014 tax returns, JZ Insurance filed as a sole proprietorship. (See [Father]'s Exhibit "134".)
>
> . . . .
>
> 136.   Per [Father], [Mother] did not actually work for JZ Insurance.
>
> . . . .
>
> 140.   Through JZ Insurance, [Father] is an independent contractor with Insurance Associates, Inc. (hereafter "IA").
>
> 141.   Ms. Surita Savio is the owner of IA.
>
> 142.   Per Ms. Savio, [Father] does not have an employment agreement or written contract for work he performs for IA.
>
> 143.   [Father] is an agent that does work through IA, he is not an agency himself.

---

> **(e)**   an itemized statement of the actual division by the court of each of the assets/debts owned/owed at the time of the divorce;
>
> **(f)**   an itemized statement of the specifics of each material difference between **(i)** the Partnership Model Division and **(ii)** the actual division by the court; and
>
> **(g)**   a statement/explanation of the court's reason(s) for each material difference.

Gordon, 135 Hawaiʻi at 351 n.16, 350 P.3d at 1019 n.16 (bold added) (citing Higashi, 106 Hawaiʻi at 230, 103 P.3d at 390).

144. [Father] "services" accounts. Per Ms. Savio "service" means running around talking to people, to include customers and underwriters.

145. Ms. Savio did meet with both [Father] and [Mother] prior to [Father] becoming an agent with IA.

146. Ms. Savio recalls at the time of the meeting that [Mother] had a full-time job and that [Father] would be doing most of the work.

147. [Father] receives commissions for work performed based on an oral agreement with IA as to the commission scale. The commission structure is the same for all accounts, not just "house accounts".

148. IA provided JZ Insurance with office space, computers, and office furniture.

149. [Father] works out of the IA office. He does not pay rent to IA, but a portion of his commissions does [sic] go towards his share of the IA overhead.

150. JZ Insurance has no employees.

151. [Father] has a "book of business" which lists all of the accounts that he services.

152. Approximately ninety percent (90%) of [Father]'s "book of business" are "house accounts". The other ten percent (10%) are owned by [Father].

153. "House accounts" are those accounts that were referred to or provided to [Father] through IA or another agent with IA.

154. [Father] services the "house accounts" but does not own them.

155. If [Father] were to leave IA to work with another agency, he would not be permitted to take the "house accounts" with him, nor can [Father] transfer those acccounts [sic] outside of IA.

156. Only the customer of those "house accounts" may decide to leave IA. The agent cannot decide to take these accounts when they leave IA.

. . . .

163. JZ Insurance owes IA $507,615.13. Said amount is made up of $4,412.68 for a US Bank credit card, $37,140.53 for a AMEX credit card, $135,000.00 in loans to JZ Insurance, and $331,061.92 in uncollected premiums due by clients (ie. [sic] "bad premium debt"). (See [Father]'s Exhibit "84".)

164. Each agent for IA is responsible for their "bad premium debt" as it is their job to collect the funds.

165. Outstanding "bad premium debt" owed to IA is paid through [Father]'s commission income.

Mother does not dispute that:

> 160. [Mother] did work at IA for approximately eight months about ten to twelve years ago. During that time [Mother] had a full-time job and shortly thereafter she stopped working to be a stay at home mother.

The property division chart attached to the family court's Findings & Conclusions (**PDC**)[8] showed the value of JZ Insurance Services, LLC at the DOCOEPOT to be $0.00. The family court's finding of zero value was based upon the opinion testimony of Father's valuation expert Gary Kuba. The family court made the following findings of fact, all of which were supported by substantial evidence:

> 172. Gary Kuba, CPA, ABV, ASA was stipulated as an expert regarding business valuations.
>
> 173. Per Mr. Kuba's Fair Market Valuation for JZ Insurance dated September 25, 2018, using the asset approach the fair market value was zero.
>
> 174. Mr. Kuba testified that in actuality it has a negative value due to the debt owed by JZ Insurance to IA. (See [Father]'s Exhibit "80".)
>
> . . . .
>
> 176. Per Mr. Kuba JZ Insurance is a company, but not a business as it has no characteristics of a stand-alone business. All other agents of IA receive their commission checks in their individual names.
>
> 177. Ms. Savio also provided a letter dated July 18, 2018, which stated that there was no broker agreement with JZ Insurance and that any transfer of accounts would require clearing all past account balances, loans and approval of IA. (See [Father]'s Exhibit "85".)
>
> 178. Mr. Kuba testified that as a business valuator he is mandated to consider all three valuation approaches.
>
> 179. Per Mr. Kuba, using the market approach to value JZ Insurance is inappropriate because you would have to use the agency multiplier and JZ Insurance is not an agency. This method would leave the value of JZ Insurance as zero.
>
> 180. Per Mr. Kuba, the use of the income approach would require having an employee to generate commissions. That person would then need to be paid. Between payroll and overhead all of the cash flow would be consumed. This would leave the value of JZ as zero.

---

[8] The family court appears to have adopted Father's proposed property division chart without any changes. It does not appear that Mother offered a proposed property division chart to the family court, either as a trial exhibit or in her proposed findings of fact and conclusions of law.

181. In determining the value, Mr. Kuba did consider the approximate ten percent (10%) of JZ Insurance accounts that do not belong to IA. He included the commissions from these accounts, but with all of the debt on JZ Insurance, the business would still be running at a negative.

182. Mr. Kuba does believe that <u>Antolick</u> [sic] does apply to this case as [Father]'s sole efforts in servicing the accounts is what created the cash flow.

(Underscore in original.) The family court rejected the valuation opinions of Mother's expert, Eddy Nelson Kemp, because:

186. Mr. Kemp based his report on a schedule created by [Mother]'s counsel that only included gross profit and no expenses. (See [Mother]'s Exhibit "L".)

187. Mr. Kemp did not talk to [Father] or [Mother] as part of his evaluation and only spoke to Ms. Savio regarding limited generalities of her business, but not specifically about his valuation or JZ Insurance.

188. Mr. Kemp was further provided a summary prepared by [Mother]'s attorney of the testimony of Ms. Savio and Mr. Kuba.

189. Mr. Kemp did not receive the same documents provided to Mr. Kuba. (See [Father]'s Exhibit "83".)

190. Mr. Kemp did receive the parties' tax returns, but did not consider them.

191. Mr. Kemp based his valuation on the market approach, with the assumption that the policies are all owned by JZ Insurance and that they could be sold to an outside source.

192. Mr. Kemp did not use the asset based approach as he did not have the appropriate information.

193. Mr. Kemp did not believe that Mr. Kuba's report considered the possibility that there could be a willing buyer. But, *if there was no willing buyer the value of the business would be zero.*

194. Mr. Kemp testified that he did understand that JZ Insurance was an agent under the IA umbrella and that he received no evidence that JZ Insurance has worked with any other agency.

195. Mr. Kemp testified that his evaluation was based on three assumptions: (1) there are no contracts between JZ Insurance and IA, (2) all client accounts belong to JZ Insurance, and (3) IA would not allow a $400,000.00 debt to be incurred by JZ Insurance.

196. Mr. Kemp does not believe that <u>Antolik</u> is binding on this case as he believes that the accounts can be transferred.

(Bold italics added.)

Antolik v. Harvey, 7 Haw. App. 313, 761 P.2d 305 (1988), referred to by both Kuba and Kemp, was a divorce case in which we stated:

> When dividing and distributing the value of the property of the parties in a divorce case, the relevant value is, as a general rule, the fair market value (FMV) of the parties' interest therein on the relevant date. We define the FMV as being the amount at which an item would change hands from a willing seller to a willing buyer, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.
>
> . . . .
>
> . . . Whatever approach or combination of approaches is used to support an amount, it must always be remembered that (1) in divorce cases the sole object of the exercise is to determine the FMV of the business on the relevant date and (2) absent special circumstances, the value of a sole proprietorship professional business does not include, and must be separated from, the value attributable to the sole professional who operates it.

Id. at 318-19, 761 P.2d at 309. In Antolik the husband was a chiropractor; at issue was the valuation of his business, Kalaheo Chiropractic. The husband's expert witness first calculated an adjusted net book value of Kalaheo Chiropractic's business's assets (which would include physical assets such as furniture, fixtures, and equipment), then valued the patient charts as if the husband had died, for a total value of about $48,000. We held:

> As an operating business, Kalaheo Chiropractic has no more than two types of willing buyers: investors and licensed chiropractors. The investor is primarily concerned with the certainty of Kalaheo Chiropractic's future net income which depends substantially on Husband's continued presence and production or on the in-fact transfer of the existing patient base to a replacement chiropractor who is no less productive than Husband. The chiropractor is primarily concerned with the in-fact transfer of Kalaheo Chiropractic's existing patient base from Husband to [them]. If Husband can quit, if Husband can stay but decrease his production, or if the existing patient base of Kalaheo Chiropractic will not transfer to the replacement chiro- practor, then the investor's and the chiropractor's primary concerns will not have been satisfied and both will be unwilling to pay anything for goodwill.
>
> Kalaheo Chiropractic cannot require its existing patient base to transfer to a chiropractor who replaces Husband. Moreover, Kalaheo Chiropractic cannot prevent Husband from quitting, from decreasing his production, or from opening a nearby competing business and encouraging its existing patient base to follow him. In other words, Kalaheo Chiropractic has no enforceable legal right to Husband's continued services or to his agreement not to

> compete if he decides to leave it. If Kalaheo Chiropractic does not own the enforceable legal right to Husband's continued services and to prevent Husband from quitting and competing with it, then the valuation of Kalaheo Chiropractic's goodwill, if any, cannot be based on the assumption that Kalaheo Chiropractic can legally force Husband to continue his services to it and prevent Husband from quitting and competing with it.

Id. at 320, 761 P.2d at 310.

This case presents an analogous situation because JZ Insurance operates out of IA and owns no physical assets. Its value consists solely of the cash flow that could be generated by Father earning commissions through IA (subject to Father's debt to IA). Mother has not challenged the following conclusions of law by the family court:

> 40. For business valuations, fair market value is the amount at which a willing seller would sell to a willing buyer when both have reasonable knowledge of relevant facts and neither is under a compulsion to buy or sell. Antolik v. Harvey, 7 Haw. App. 313, 319, 761 P.2d 305, 309 (1988).
>
> 41. In determining whether the goodwill of a business constitutes marital property, a distinction must be made between (1) true goodwill (also known as enterprise goodwill) which is a marketable business asset, and (2) the goodwill which is dependent on the continued presence of the professional involved. The former constitutes marital property, while the latter does not. Id. at 318.
>
> 42. The value of any goodwill separate and apart from the efforts of [Father] himself is zero.

Mother contends that the following conclusions of law are erroneous:

> 43. [Father] owns 100% of JZ Insurance Services, LLC.
>
> 44. The value of [Father]'s business known as JZ Insurance Services, LLC is determined to be zero dollars and said business shall be awarded to [Father], subject to any debt thereon.

Conclusions of law nos. 43 and 44 are mixed findings of fact and conclusions of law. We hold that the family court's findings of fact were supported by substantial evidence and were not clearly

erroneous, and that the family court did not err in concluding that the value of JZ Insurance at the DOCOEPOT was zero.[9]

### B.    New Communications

Mother contends that the family court "erred in including New Communications in the Property Division Chart." The PDC showed the value of New Communications at the DOCOEPOT to be $0.00. A note to the PDC stated that "New Communications was listed on [Father]'s Asset and Debt Statement, but no testimony was provided regarding said business." The family court concluded:

> 45.    No evidence was presented as to [Mother]'s business known as New Communications; it is awarded to [Mother], subject to any debt thereon.
>
> 46.    [Father] shall be awarded the business known as JZ Insurance, LLC and [Mother] shall be awarded the business known as New Communications. Each party shall also be awarded any assets associated with the respective businesses they are awarded as well as be solely responsible for any debts associated with the respective business they are awarded.[[10]]

Mother had previously stated that her "former business, New Communications, LLC is no longer in business and does not exist as of December 2009." That being the case, the family court did not err in finding the value of New Communications to be zero and awarding it to Mother.

### C.    The Kailua Property

Mother owned three pieces of real property immediately prior to the marriage: (1) in Kailua, Hawai'i (**Kailua Property**); (2) in Sacramento, California (**Sacramento Property**); and (3) in Marysville, California (**Marysville Property**). Mother does not contest that upon marriage, this property became Marital

---

[9]    Based upon Kuba's opinions, the family court could have found that JZ Insurance had a negative value, but Father has not made that argument and is bound by the valuation of zero. The family court did not apportion any of JZ Insurance's debt to Mother. See Findings & Conclusions, conclusion of law no. 46 (quoted below).

[10]    Father did not attempt to have Mother assume any of the $507,615.13 debt owed to IA by Father/JZ Insurance. See Findings & Conclusions, finding of fact no. 163.

Partnership Property.[11]  Mother contends that "the Kailua [P]roperty was not equally divided but should have been."  Mother does not challenge the following findings of fact:

> 218.  [Mother] purchased the [Kailua P]roperty . . . for $1,250,000.00 [before the marriage].
>
> 219.  . . . [T]he value of the [Kailua P]roperty . . . on March 15 [sic], 2008[12] was $1,180,000.00.  (See [Father]'s Exhibit "92".)  . . . [R]eal estate prices across the island of Oahu dropped during this time period.
>
> . . . .
>
> 223.  The outstanding mortgage balances on the [Kailua P]roperty on the date of marriage were $996,000 and $244,000. (See [Father]'s Exhibit "61".)
>
> . . . .
>
> 226.  The appraised value of the [Sacramento P]roperty . . . as of March 16, 2008[,] was $315,000.00. (See [Father]'s Exhibit "94".)
>
> 227.  The date of marriage mortgage values for the [Sacramento P]roperty was [sic] $258,991.00 and $91,009.00. (See [Father]'s Exhibit "61").
>
> . . . .
>
> 229.  The appraised value of the [Marysville P]roperty . . . as of March 16, 2008[,] was $194,000.00. (See [Father]'s Exhibit "96".)
>
> 230.  The date of marriage mortgages for the [Marysville P]roperty were in the amounts of $54,000.00 and $221,000.00. (See [Father]'s Exhibit "61").

The PDC accurately shows that the net value of Mother's Premarital Separate Property on the date of marriage was <$176,000.00>.  Mother's premarital debt is the root of her discontent.

The family court found, and Mother does not contest, that the Sacramento Property and the Marysville Property had both been sold.  The family court awarded the net proceeds from those sales, totaling $90,925.94, to Mother.  Finding of fact no. 235 states, and Mother does not contest, that the Kailua Property was

---

[11]    Neither party submitted evidence of Father's ownership of Premarital Separate Property.

[12]    This appears to have been a typographical error.  The date of marriage was March 16, 2008.  Father's trial exhibit 92 indicates that the valuation date was actually March 16, 2008, not March 15, 2008.

sold for $1,320,000 during the pendency of the divorce trial. Mother challenges the following conclusion of law:

> 35. Real Property.
>
> . . . .
>
> b.     At the time of trial the Kailua [P]roperty had been listed for sale, but had yet to close.  The proceeds shall be used to first pay all closing costs, the first mortgage, and HELOC [home equity line of credit] on said property.  [Mother] shall then receive $40,000.00 from the net proceed and [Father] shall be awarded the remaining balance of the net proceeds.

The family court did not make a finding of fact concerning the balance of the first mortgage or the HELOC, but the PDC indicates that the mortgage balance was $911,967.72 and the HELOC balance was $123,386.00.  Thus, Mother received $130,925.94 from the sales of the three properties, while Father received $244,646.28 — a difference of $113,720.34.

Mother contends that the family court failed to conduct the four-part analysis required by Gordon, 135 Hawai'i at 351, 350 P.3d at 1019, before departing from the equal distribution model.  Mother would be correct if the distribution of the parties' real property is viewed in isolation.  But Part A of the PDC lists all Marital Partnership Property, and divides the assets and debts.  Mother and Father each had substantial post-marital debt.  The NMV of Marital Partnership Property on the DOCOEPOT was $86,006.16.  The net value of Mother's Premarital Separate Property on the date of marriage — i.e., Mother's capital contribution — was <$176,000.00>.  After accounting for Mother's premarital debt, under the equal distribution model Mother owed Father a $72,137.12 equalization payment.  If Mother had been awarded nothing from the sale of the Kailua Property, Mother would still have owed an equalization payment of $32,137.12.  We hold that the family court did not err by awarding Mother $40,000 more than what she would have been entitled to under the equal distribution model.

## D.   Equalization

The D&O stated:

> 8.   Property Division. The assets and debts are hereby divided as set out in the Property Division Chart ("PDC") attached hereto as Exhibit "B". The Court finds valid and relevant circumstances for an equitable deviation from the partnership principles in this matter. As such, [Mother] will not be required to pay the equalization payment as set out in the PDC.

The Decree stated:

> 11.   Property Division. The assets and debts are hereby divided as set out in the Property Division Chart ("PDC") attached hereto as Exhibit "2". The Court finds valid and relevant circumstances for an equitable deviation from the partnership princples [sic] in this matter. As such, [Mother] shall not be required to pay the equalization payment as set out in the PDC.

(Bold omitted.)

Mother contends that she should not have been subject to an equalization payment because the family court erred in calculating the value of JZ Insurance. As explained above, the family court did not err in finding that the value of JZ Insurance was zero. Even if the family court erred by not conducting the four-part analysis required by Gordon, 135 Hawai'i at 351, 350 P.3d at 1019, there was no prejudice to Mother because Mother would have owed Father $32,137.12 under the partnership distribution model. We need not address Mother's appeal on the deviation issue. See Wong v. Wong, 87 Hawai'i 475, 484, 960 P.2d 145, 154 (App. 1998) (where family court deviated from partnership model division in favor of appellant, and appellee did not challenge family court's authority to deviate, deviation was not an issue in the appeal).

## E.   Attorney's Fees

Mother contends that the family court erred in awarding attorney's fees to Father. HRS § 580-47(f) provides:

> Attorney's fees and costs. The court hearing any motion for orders either revising an order for the custody, support, maintenance, and education of the children of the parties, or an order for the support and maintenance of one party by the other, or a motion for an order to enforce any such order or any order made under subsection (a) of this section, may make such orders requiring either party to pay or contribute to the payment of the attorney's fees, costs,

25

and expenses of the other party relating to such motion and hearing as shall appear just and equitable after consideration of the respective merits of the parties, the relative abilities of the parties, the economic condition of each party at the time of the hearing, the burdens imposed upon either party for the benefit of the children of the parties, the concealment of or failure to disclose income or an asset, or violation of a restraining order issued under section 580-10(a) or (b), if any, by either party, **and all other circumstances of the case.**

(Bold italics added.) "[A]n award of attorney's fees is in the sound discretion of the [family] court, limited only by the standard that it be fair and reasonable." Hamilton, 138 Hawai'i at 209, 378 P.3d at 925 (citing cases).

The D&O states, in relevant part:

> 10. Attorney Fees. [Father] shall be awarded the amount of $2,919.00 for defending against [Mother]'s Motion to Enforce Postnuptial Agreement filed July 19, 2018, the amount of $523.50 for having to file [Father]'s Motion to Compel filed September 13, 2018, and the amount of $1,062.00 for having to file [Father]'s Second Motion to Compel filed October 30, 2018. As such [Mother] shall owe to [Father] the total amount of $4,504.50. Said amount shall be paid within 120 days of the filing of this Decision and Order.

The Decree states, in relevant part:

> 24. Attorney's Fees: [Father] shall be awarded the amount of $2,919.00 for defending against [Mother]'s Motion to Enforce Postnuptial Agreement filed July 19, 2018, the amount of $523.50 for having to file [Father]'s Motion to Compel filed Sept4ember [sic] 13, 2018, and the amount of $1,062.00 for having to file [Father]'s Second Motion to Compel filed October 30, 2018. As such, [Mother] shall owe to [Father] the total amount of $4,504.50. Said amount shall be paid to [Father] by September 11, 2019 (i.e., 120 days from the Decision and Order filed on May 14, 2019).

The Findings & Conclusions state, in relevant part:

> 255. [Father]'s request for attorney's fees for having to defend against the Motion to Enforce Post-Nuptial agreement was reserved for the trial judge per the Order [on] Oral Motion to Withdraw Motion to Enforce Post-Nuptial Agreement Dated March 23, 2018[,] and Financial Restraining Order filed August 20, 2018.

> 256. [Mother] admitted that she did not produce the original post-nuptial agreement to [Father] as they requested.

> 257. Upon reviewing old check registers, [Mother] began doubting the authenticity of the signatures on the post-nuptial agreement.

> 258. [Mother] testified that she hired a handwriting expert after she filed her Motion to Enforce Post-Nuptial

26

> Agreement and it was at this point she realized that her alleged signature was not hers.
>
> . . . .
>
> 49.    [Father] shall be awarded the amount of $2,919.00 for defending against [Mother]'s Motion to Enforce Post-nuptial [sic] Agreement filed July 19, 2018, the amount of $523.50 for having to file [Father]'s Motion to Compel filed September 13, 2018, and the amount of $1,062.00 for having to file [Father]'s Second Motion to Compel filed October 30, 2018.  As such [Mother] shall owe to [Father] the total amount of $4,504.50.  Said amount shall be paid within 120 days of the filing of the Decision and Order.

The Judgment states, in relevant part:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is hereby entered against [Mother], in favor of [Father], the amount of $4,504.50 for [Father]'s attorney's fees and costs, per the Decree Granting Absolute Divorce and Awarding Child Custody filed concurrently herewith, which is the total of the following amounts:
>
> a)    $2,919.00 for defending against [Mother]'s Motion to Enforce Postnuptial Agreement filed July 19, 2019 [sic];
>
> b)    $523.50 for having to file [Father]'s Motion to Compel filed Sept4ember [sic] 13, 2018, and;
>
> c)    $1,062.00 for having to file [Father]'s Second Motion to Compel filed October 30, 2018.
>
> As such, [Mother] shall pay to [Father] the total amount of $4,504.50 by September 11, 2019 (i.e., 120 days from the Decision and Order filed on May 14, 2019), plus statutory post-judgment interest accruing thereon after September 11, 2019.

### 1.    **Mother's motion to enforce postnuptial agreement**.

On July 19, 2018, Mother filed a motion to enforce what she claimed was the parties' "Postnuptial Agreement," dated March 23, 2008 (the date of the marriage was March 16, 2008). The motion included Mother's affidavit authenticating the alleged postnuptial agreement — purportedly signed by both parties — and stating, "We agreed to enter into a postnuptial agreement because I had significantly more assets than [Father]."

Father filed a memorandum in opposition on August 9, 2018, stating "he is certain that the signature[s] on the alleged postnuptial agreement . . . and the financials attached to it are not his."  Father denied entering into the agreement and pointed out contradictory statements made by Mother in a previous declaration, Mother's failure to respond to Father's requests to

see the original postnuptial agreement, and Mother's eventual concession that she did not have possession of the original. Father stated there was

> some amount of discussion about a postnuptial agreement, but that he refused to enter into it because [Mother] did not have significantly more assets. They were paying expenses jointly, the [Sacramento and Marysville] properties had significant negative equity and were on interest only loans.
>
> . . . [H]e refused into [sic] a marital agreement under these circumstances because he was being expected to contribute his earnings to all of these properties, some in the negative and with an uncertain future.

The motion was heard on August 15, 2018.[13] Mother's counsel stated:

> [M]y client would respectfully request to withdraw her motion to enforce without prejudice. Without rehashing everything that was discussed in pretrial, Your Honor, the basis of my client's request to withdraw is based in large part that since the filing of her motion, she has discovered that the original that she -- the original that she located is -- is really not the accurate original. Based on her own due diligence that she -- that she performed, not only does it appear that [Father]'s signature is a fake, but it also appears that her signature as well is not her signature.

After hearing argument from Father's counsel (which included an oral request for fees and costs), the family court addressed Mother's counsel:

> Let me say this though. It's not only [Father's counsel] who's troubled, but I'm also troubled by the fact that a document was put forward that allegedly formed the basis of the motion that's before me that's now being withdrawn, that did bear signatures which turned out to -- at this point it's acknowledged that apparently it's not the signature of [Father]. And it may not even be the signature of your client. So am I troubled by that? Yes, I am. Is [Father's counsel] right to be troubled by that? I think he is right to be troubled by that.
>
> So -- so I'm allowing -- I'm going to allow you to withdraw your motion.
>
> This is what I'm going to do, [Father's counsel]. I'm going to reserve on the issues of both attorney's fees and the handwriting [expert's] fees. The handwriting [expert], if he was -- he or she were [sic] hired after the filing of this motion in preparation for hearing, file a motion on that, and I may be inclined to grant those fee -- the fees for the handwriting [expert]. Okay?

---

[13] The Honorable Kevin A. Souza presided.

> With respect to the attorney's fees, I'm just going to reserve that until you can renew that at the time of final property division. Okay? But I'll allow you to preserve that claim. Okay? I think that's the correct balance to strike given the totality of the circumstances here because I too am troubled about the fact that a motion was put forward based on a document that clearly has two signatures on it which may or may not turn out to be both forged. So you know, that's -- that's concerning to me.

The family court ultimately granted Father's request for attorney's fees relating to Mother's motion to enforce the postnuptial agreement.[14] Based on the record, we hold that the family court did not abuse its discretion in so doing. See Hamilton, 138 Hawai'i at 210, 378 P.3d at 926 (holding that award of attorney's fees to Wife was fair and reasonable where Wife's trial expenses were increased by Husband's filing of various pretrial motions).

### 2. Father's motions to compel.

On September 13, 2018, Father filed a motion to compel Mother to produce various documents requested in discovery relating to at least four trusts in which Mother had a potential interest, with "assets . . . in the millions of dollars." On October 30, 2018, Father filed a second motion, to compel Mother to produce various financial records that had been requested in discovery. Mother's counsel filed responsive declarations on November 7, 2018, and November 14, 2018. The motions were heard on November 14, 2018.[15] The family court ruled that any exhibit offered at trial that was the subject of a legitimate discovery request but not produced will not be allowed into evidence, and that "Any attorney's fees regarding lapses in discovery are reserved for the trial court." The family court ultimately granted Father's requests for attorney's fees in connection with his motions to compel discovery, as it was authorized to do under Rule 37(a)(4) of the Hawai'i Family Court Rules.[16] Mother's opening brief makes no discernible argument that the family court

---

[14] The Honorable Jessi L.K. Hall signed the order.

[15] The Honorable John C. Bryant, Jr. presided.

[16] The Honorable Jessi L.K. Hall signed the order. Mother has not challenged the amounts of the fee awards.

abused its discretion in awarding Father the attorney's fees he incurred in connection with his motions to compel discovery. Thus, we decline to address her contention. See Kakinami v. Kakinami, 127 Hawai'i 126, 144 n.16, 276 P.3d 695, 713 n.16 (2012) (citing In re Guardianship of Carlsmith, 113 Hawai'i 236, 246, 151 P.3d 717, 727 (2007) (noting that appellate court may "disregard a particular contention if the appellant makes no discernible argument in support of that position") (internal quotation marks and brackets omitted)).

## IV.   Spousal Support

HRS § 580-47(a) requires the family court to consider the following criteria when making further orders for the support and maintenance of either spouse: "the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, . . . and all other circumstances of the case." The family court must also consider all of the following factors in ordering spousal support and maintenance:

(1)   Financial resources of the parties;

(2)   Ability of the party seeking support and maintenance to meet [their] needs independently;

(3)   Duration of the marriage;

(4)   Standard of living established during the marriage;

(5)   Age of the parties;

(6)   Physical and emotional condition of the parties;

(7)   Usual occupation of the parties during the marriage;

(8)   Vocational skills and employability of the party seeking support and maintenance;

(9)   Needs of the parties;

(10)  Custodial and child support responsibilities;

(11)  Ability of the party from whom support and maintenance is sought to meet [their] own needs while meeting the needs of the party seeking support and maintenance;

(12)  Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and

(13)  Probable duration of the need of the party seeking support and maintenance.

Hamilton, 138 Hawai'i at 209, 378 P.3d at 925 (citations omitted). When deciding the issue of spousal support:

> The first relevant circumstance is the payee's need. What amount of money does [the payee] need to maintain the standard of living established during the marriage?
>
> The second relevant circumstance is the payee's ability to meet [their] need without spousal support. Taking into account the payee's income, or what it should be, including the net income producing capability of [their] property, what is [their] reasonable ability to meet [their] need without spousal support?
>
> The third relevant circumstance is the payor's need. What amount of money does [the payor] need to maintain the standard of living established during the marriage?
>
> The fourth relevant circumstance is the payor's ability to pay spousal support. Taking into account the payor's income, or what it should be, including the income producing capability of [their] property, what is [their] reasonable ability to meet [their] need and to pay spousal support?
>
> When answering any of the above questions, the following two rules apply: Any part of the payor's current inability to pay that was unreasonably caused by the payor may not be considered and must be ignored. Any part of the payee's current need that was caused by the payee's violation of [their] duty to exert reasonable efforts to attain self-sufficiency at the standard of living established during the marriage may not be considered and must be ignored.

Wong, 87 Hawai'i at 485, 960 P.2d at 155 (cleaned up).

In this case Mother requested spousal support, but the family court reduced Mother's child support obligation in lieu of awarding her spousal support. The family court found and concluded:

> 115. [Father] testified that the marital debt needs to be paid before alimony is paid.
>
> 116. In 2011, [Mother] was diagnosed with fibromyalgia, which led to depression and anxiety. Despite this, she continued to work until 2014.
>
> 117. [Mother] testified that in 2014 she was able to control her illness to the point she was functional.
>
> 118. [Mother]'s Social Security Disability Insurance application dated December 9, 2014 listed her limitations, to include but not limited to, not being able to walk, to only be able to sit for 30 minutes at a time, only able to stand up for 10 minutes at a time, and unable to care for herself without assistance. (See [Father]'s Exhibit "65".)
>
> 119. [Mother] signed the 2015 Federal tax return stating that she was disabled. (See [Father]'s Exhibit "135".)

120. [Mother] testified that recently her health has improved and that she is no longer unable to obtain employment due to a disability.

121. [Mother] has academic and professional credentials to include: Bachelor of Arts, Masters in Business Administration, Insurance License, and Real Estate License.

122. [Mother] testified that she is highly qualified in the areas of Business Administration and sales.

123. [Mother] obtained employment on or about February 7, 2019[,] at Allstate Insurance as a Marketing Coordinator (See [Mother]'s Exhibit "JJJJJ".)

124. Prior to Allstate Insurance, [Mother] was last employed at United Auto Credit until January 2016.

125. [Mother] testified that she is starting a non-profit organization.

126. [Mother]'s counsel stated on December 3, 2018, at the beginning of trial that [Mother]'s position had changed and her request was for [Father] to pay her alimony of $2,000-$2,500 per month for nine months and then $1,000-$1,500 per month for six months.

127. [Mother] requested on direct examination that [Father] pay alimony of $10,838.62 per month. No duration was provided.

128. In closing argument [Mother]'s counsel requested $11,000 per month in alimony. No duration was provided.

129. [Mother] did not provide the Court with back up documents for the expenses listed on her Income and Expense Statement filed April 1, 2019.

130. [Mother] did not testify as to a plan to obtain self-sufficiency.

. . . .

29. In lieu of alimony, [Mother]'s child support obligation shall be reduced.

30. It is reasonable for [Mother] to receive financial assistance by way of a reduction of child support for a period of one year.

The Decree stated, in relevant part:

5. Child Support.

. . . .

b) [Mother]'s Obligation.

(1) From 6/1/2019 through 5/31/2020. The Court imputes [Father]'s income for child support purposes to be $18,000.00 per month, and [Mother]'s income for child support purposes to be $10,210.00 per month ([Mother] shall continue to collect the Social Security Disability payments for the minor children as said amount is included in her income[)].

> Pursuant to the attached Child Support Guidelines Worksheet (see Exhibit "1"), [Mother] would pay to [Father] as and for the support, maintenance, and education of the parties' three (3) minor children, the amount of $1,004.33[ ]per child per month, for a total of THREE THOUSAND THIRTEEN AND NO/100 DOLLARS ($3,013.00) per month.
>
> However, based on [Mother]'s request for alimony, the Court finds an exceptional circumstance to reduce child support to $500.00 per child per month, for a total of $1,500.00 per month. Said sum of $1,500.00 shall be paid in two (2) equal installments of $750.00 each, on the 1st and 15th days of each month, commencing on June 1, 2019 and shall continue at that rate until June 1, 2020.
>
> . . . .
>
> (2) From 6/1/2020 and Thereafter. Commencing on June 1, 2020, [Mother]'s child support obligation shall increase to the sum of $1,004.33 per child per month, for a total of $3,013.00 per month. Said sum of $3,013.00 shall be paid in two (2) equal installments of $1,506.50 each, on the 1st and 15th days of each month, commencing on June 1, 2020.
>
> . . . .
>
> 8. Alimony. [Mother]'s request for alimony is denied, subject to the provisions of paragraph 3 [sic] hereinabove, entitled, "Child Support".

The family court did not first calculate the amount of spousal support to which Mother would otherwise be entitled under HRS § 580-47(a), utilizing the factors and principles set forth in Wong, 87 Hawai'i at 485, 960 P.2d at 155, and Saromines v. Saromines, 3 Haw. App. 20, 27, 641 P.2d 1342, 1348 (1982). It appears that the family court considered Mother's ability to support herself, lack of a plan to obtain self-sufficiency, and failure to demonstrate her standard of living during the marriage.[17] However, there are no findings relating to Mother's ability to meet her needs without spousal support, or to Father's need or his ability to pay spousal support.

In addition, because we are vacating the family court's income and child support calculations, on remand the family court should also consider whether changes in its child support calculations, if any, impact its decision regarding spousal support.

---

[17] According to finding of fact no. 129, "[Mother] did not provide the Court with back up documents for the expenses listed on her Income and Expense Statement filed April 1, 2019." We question whether Mother provided the family court with evidence sufficient to determine her standard of living during the marriage. HRS § 580-47(a)(4); Wong, 87 Hawai'i at 485, 960 P.2d at 155.

## CONCLUSION

Based upon the foregoing, we: **(1)** affirm the family court's award of sole physical custody of the Children to Father, subject to Mother's visitation rights set forth in the Findings & Conclusions; **(2)** affirm the family court's calculation of Mother's imputed monthly gross income, vacate the family court's calculations of Father's imputed gross monthly income and the parties' resultant child support obligations, and remand for the family court to enter specific findings of fact explaining its calculation of Father's imputed gross monthly income or to recalculate (if necessary) the amount of Father's monthly gross income (using Appendix E to the Guidelines) and the parties' child support obligations (using the CSG Worksheet); **(3)** affirm the family court's valuations of JZ Insurance and New Communications, division of property, elimination of Mother's equalization payment, and award of attorney's fees incurred by Father in connection with Mother's motion to enforce the alleged postnuptial agreement and Father's motions to compel discovery; and **(4)** vacate the family court's reduction of Mother's child support obligation in lieu of awarding her spousal support, and remand for the family court to make findings regarding Mother's need and her ability to meet her need without spousal support, and Father's need and his ability to pay spousal support. Because we are vacating the family court's child support calculations, on remand the family court should also consider whether changes in its child support calculations, if any, impact its decision regarding spousal support.

DATED:  Honolulu, Hawai'i, May 21, 2020.

On the briefs:

Paul W. Soenksen,
for Plaintiff-Appellee.

Rebecca A. Copeland,
for Defendant-Appellant.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Derrick H.M. Chan
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge